UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| NORTHFIELD INSURANCE COMPANY, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION H-09-2077 |
| | § | |
| MID-CONTINENT CASUALTY COMPANY, | § | |
| | § | |
| *Defendant.* | § | |

ORDER

This is a removal action premised upon diversity of citizenship.  Pending before the court are plaintiff Northfield Insurance Company's renewed motion for summary judgment (Dkt. 24),[1] and two motions for partial summary judgment filed by defendant Mid-Continent Insurance Company (Dkts. 18, 23).  Upon consideration of the motions and all responsive pleadings, as well as the evidence submitted and the applicable law, plaintiff Northfield Insurance Company's motion is DENIED, and defendant Mid-Continent's motions are GRANTED.

BACKGROUND

On November 19, 1999, 12 Texas A&M University students were killed, and 27 others were injured, when a structure being prepared for an annual bonfire collapsed.  Litigation ensued as families of the deceased students, and some of the injured students, sought damages from all persons involved in the construction of the bonfire, and the various cases were consolidated in a single action in the District Court of Brazos County, Texas, *In re: Bonfire Injury Cases*, Cause No. 03-001246-CV-361.  Mid-Continent Casualty Company ("Mid-Continent") assumed the defense of the Texas

---

[1]      The prior motion was denied without prejudice. Dkt. 17.

A & M Board of Regents and certain other named defendants affiliated with the University pursuant to an insurance policy Mid-Continent issued specifically with respect to the bonfire and with an occurrence limit of $1 million ("the Mid-Continent Policy").

Scott-Macon, Ltd. ("Scott-Macon") is a company that rented a crane used during construction of the bonfire, and it, too, was sued in the consolidated state court proceeding.  Scott-Macon was insured by plaintiff Northfield Insurance Company ("Northfield") pursuant to a commercial general liability policy, and Northfield retained counsel to represent Scott-Macon in the state court litigation.

Mid-Continent paid out the balance of the limits of its insurance policy on October 28, 2008, in furtherance of a settlement of the state court litigation.  The settlement released Texas A & M University and others covered under the Mid-Continent Policy, but Scott-Macon was not included in the settlement, and did not obtain a release of liability.

Northfield commenced this litigation on May 26, 2009, by filing an original petition in Brazos County District Court.  Northfield seeks reimbursement from Mid-Continent for all costs incurred in Northfield's defense of Scott-Macon.  The petition is in five counts.  In Count I, Northfield alleges that Mid-Continent breached an implied-in-fact[2] contract to "share the costs associated with the defense of Scott-Macon."  Dkt. 1, Exh. B at 5.  Northfield requests declaratory relief in Count II in the nature of a finding that Mid-Continent agreed to pay one-half of the defense costs, but "failed to participate in or pay any portion of the costs" incurred to defend Scott-Mason. *Id.* at 5-6.  Counts III and IV are claims for contribution and subrogation premised upon the Mid-Continent Policy and Scott-Macon's alleged status as an "additional insured" under that policy.  *Id.*

---

[2]     The petition does not identify the precise nature of the alleged contract, but Northfield's subsequent pleadings make it clear that it is asserting an "implied-in-fact" contract that will be discussed in more detail below.

2

at 6.  Count V is a demand for attorneys' fees.  *Id*.  The matter was timely removed to this court.
Dkt. 1.

Mid-Continent has filed a motion for partial summary judgment asserting that all of
Northfield's claims for reimbursement of defense costs incurred prior to May 26, 2005, are barred
by the applicable statute of limitations.  Dkt. 18.  Mid-Continent also asserts that it is entitled to
summary judgment with respect to Northfield's claims for defense costs incurred after October 28,
2008, because Mid-Continent exhausted its policy limits in payment of settlement proceeds on that
date.  Northfield contests the first argument, but concedes the second.  Dkt. 21.

Mid-Continent also seeks summary judgment with respect to Northfield's claim that an
implied-in-fact contract exists.  Dkt. 23.  Northfield opposes this motion and itself has moved for
summary judgment asserting that it has established the existence of an implied-in-fact contract
whereby Mid-Continent agreed to pay one-half of Scott-Macon's cost of defense.  Dkt. 24.

## Factual Background

Scott-Macon was sued by the estate of Jerry Don Self in the state court and Attorney Randy
Nelson was hired by Northfield to represent Scott-Macon.  In a June 4, 2001, letter to Lee Laursen,
a claims examiner for Northfield, Nelson noted that he had made three requests for Mid-Continent
to "assume [Scott-Macon's] defense" but that Mid-Continent did not then recognize Scott-Macon
as an additional insured under its policy.  Dkt. 23, Exh. D at 1.  Nelson told Laursen that "Mid-
Continent has not declined to assume the defense, but has thus far not made a decision."  *Id*.
Laursen's file notes of July 9, 2001, indicate that Mid-Continent had neither accepted nor denied
Northfield's "tender" of Scott-Macon's defense, but that he was "reasonably confident they will
accept shortly."  Dkt. 23, Ex. E at 2.

Discussions between Northfield and Mid-Continent continued.  On October 12, 2001, Jim Johnson, an attorney representing Mid-Continent, wrote to Scott-Macon attorney Nelson that "Mid-Continent Casualty Company recognizes Scott-Macon Company as an additional insured on Policy GL-15561 issued to the Board of Regents of Texas A & M University."  Dkt. 26, Exh. A-1 at 7. Johnson went on to note that Scott-Macon's status was governed by an endorsement to that policy, a copy of which was attached to the letter so that Nelson "may completely advise [his] client as to their status."  *Id*. at 7.  Johnson requested that the parties exchange relevant portions of their respective insurance policies "in order that agreement may be made on defense and indemnity costs." *Id*.

Northfield's Laursen responded to Johnson's letter on October 24, 2001, and he informed Johnson that the rental contract between the "Bonfire Committee" and Scott-Macon required "your insured to . . . include Scott-Macon as an additional insured" and also that the policy issued by Mid-Continent "was clearly required to be primary to any insurance of Scott Macon Ltd."  Dkt. 23, Exh. G.  Laursen questioned Johnson's need for copies of the Scott-Macon insurance policy, and asked Johnson to "advise" concerning his intentions.  *Id*.  On October, 29, 2001, Laursen noted in his claims file that he refused to provide the requested contract language "since the [rental] contract clearly specifies that their policy is to primary with no contribution from Scott-Macon . . . ."  Dkt. 23, Exh. E at 3.

Johnson, in turn, responded to Laursen's letter on November 8, 2001, and explained his request for copies of the "other insurance" clause of Scott-Macon's insurance policy:

> Because the only documents pertaining to defense and indemnification costs that exist between Mid-Continent and Northfield are the provisions of our respective general liability policies, the "other insurance" clauses should be matched to reach agreement on indemnification.  As to defense costs, the duty to

4

> defend arises equally under each policy.  Therefore, the defense costs
> would be split equally.

Dkt. 23, Exh. H.   Johnson testified during his deposition that, in his view, "[w]e had no understanding at that point." Dkt. 23, Exh. K at 36.  Rather, Johnson believed he was requesting that Laursen exchange information and "[t]hen we'll talk." *Id*.

The record reflects no further communication between the parties directly referencing the issue of defense costs following Johnson's November 8, 2001, letter.  In fact, Northfield concedes in its briefing that it "did not specifically agree to the terms of the offer [it believes Johnson made] to split defense costs. . . ." Dkt. 24 at 8.  Further, on November 21, 2001, Laursen wrote to Scott-Macon defense counsel Nelson that Mid-Continent "has again refused to fully accept the tender [on] a primary, noncontributing basis." Dkt. 23, Exh. I.  Laursen questioned whether the Mid-Continent agent was aware of the rental agreement language requiring that the coverage obtained by the university "was to be primary to all other coverage?"  *Id*.  Laursen's claims file notes indicate that he was "uncomfortable" on March 28, 2002, because "[Scott-Macon] is shown as an additional insured but Mid-Continent has denied acceptance." Dkt. 23, Exh. E at 4.  Laursen again wrote Nelson on March 7, 2003, and criticized Mid-Continent's position that Scott-Macon is an insured only with respect to the additional insured endorsement, and not on a primary basis. Dkt. 23, Exh. J.  "Mid-Continent takes [a] position **contrary to the contract language and as yet they have refused to accept our tender**." *Id.* (*emphasis added*).

The state court litigation proceeded with Northfield receiving monthly bills from Scott-Macon's defense counsel, which Northfield paid.  Scott-Macon defense counsel Nelson states that "since November 2001" he provided "copies of privileged and confidential defense reports, deposition summaries and other privileged defense-related documents" to Mid-Continent as well as

to Northfield and to Scott-Macon's excess carrier, Kempler Insurance Company.  Dkt. 24, Ex. A at

2.  Attorney Johnson does not recall receiving these documents on behalf of Mid-Continent, but he

attributed this to fact that he was receiving "so much information coming in from multiple sources"

at that time.  Dkt. 23, Exh. K at 91.

On December 11, 2008, after Mid-Continent paid the balance of its policy limits to settle

claims against other defendants, Scott-Macon counsel Nelson sent a letter to Mid-Continent

demanding that Mid-Continent "immediately protect Scott-Macon, Ltd.'s interests with regard to the

bonfire injury cases by negotiating a settlement and complete release for Scott-Macon, Ltd., [and]

come current on its defense obligations to Scott-Macon, Ltd."  Dkt. 26, Exh. A-1 at 11.  On

September 1, 2009, after this litigation was commenced, counsel for Northfield forwarded to Mid-

Continent copies of invoices for fees and costs in the state court defense of Scott-Macon totaling

$633,177.10.  Dkt. 18, Exh. 8.

## SUMMARY JUDGMENT STANDARD

A timely motion for summary judgment shall be granted "if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  Fed. R. Civ. P. 56(c); *see also Carrizales v. State Farm Lloyds*, 518 F.3d 343, 345

(5th Cir. 2008).  Upon a defendant's motion for summary judgment, the plaintiff "must set forth

specific facts showing that there is a genuine issue for trial. If he does not so respond, summary

judgment, if appropriate, shall be entered against him." FED. R. CIV. P. 56(e).  Ultimately, "[w]here

the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party,

there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 587, 106 S.Ct. 1348 (1986).  An issue is "material" if its resolution could affect the outcome

6

of the action. *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007). "[A]nd a fact is genuinely in dispute only if a reasonable jury could return a verdict for the non-moving party." *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).

The moving party bears the initial burden of informing the court of all evidence demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986). Only when the moving party has discharged this initial burden does the burden shift to the non-moving party to demonstrate that there is a genuine issue of material fact. *Id.* at 322. If the moving party fails to meet this burden, then it is not entitled to a summary judgment, and no defense to the motion is required. *Id.*

"For any matter on which the non-movant would bear the burden of proof at trial . . . , the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718-19 (5th Cir. 1995); *see also Celotex*, 477 U.S. at 323-25. To prevent summary judgment, "the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (*quoting* FED. R. CIV. P. 56(e)).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in favor of the non-movant. *Envtl. Conservation Org. v. City of Dallas, Tex.*, 529 F.3d 519, 524 (5th Cir. 2008). The court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence; disregard all evidence favorable to the moving party that the jury is not required to believe; and give credence to the evidence favoring the non-moving party as well as to the

evidence supporting the moving party that is uncontradicted and unimpeached. *Moore v. Willis Ind. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000).

ANALYSIS

**A. Implied-in-Fact Contract**

Both parties seek summary judgment with respect to Northfield's claim that there was an implied-in-fact contract whereby Mid-Continent agreed to pay one-half of Scott-Macon's costs of defense in the underlying state court litigation. "'A contract in fact is implied where, despite the absence of any express declaration of intent by the parties, their acts are such as to indicate, according to the common understanding and the ordinary courses of dealing between men, a mutual intent to contract.'" *A/S Hydraulico Works v. Fort Worth and Denver Ry. Co.*, 483 F.Supp. 518, 521 (S.D. Tex. 1980), *quoting*, 13 Tex. Jur. 2d Contracts, § 5 (1980); *see also*, 14 Tex. Jur. 3d Contracts § 9 (1997).[3]  The elements of a contract, express or implied, are identical. *Univ. Nat'l Bank v. Ernst & Whinney*, 773 S.W.2d 707, 710 (Tex.App.–San Antonio 1989, no writ).  "[T]he real difference between express contracts and those implied in fact is in the character and manner of proof required to establish them." *Haws & Garrett Gen. Contractors., Inc. v. Gorbett Bros. Welding Co.*, 480 S.W.2d 607, 609 (Tex. 1972).  "In each instance there must be shown the element of mutual agreement which, in the case of an implied contract, is inferred from the circumstances." *Id.*; *see also*, *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844 (Tex. 2009) (mutual assent necessary element of implied contract).  And, importantly, Northfield bears the burden of proving the existence of the alleged contract. *See Preston State Bank v. Jordan*, 692 S.W.2d 740,

---

[3]  The parties agree that Texas law governs this dispute.

744 (Tex.App.–Fort Worth 1985, no writ), citing, *Dalton v. George B. Hartley Co., Inc.*, 634 S.W.2d 374, 376 (Tex.App.–Austin 1982, no writ).

Northfield believes that a contract is established here through the "offer" made by Mid-Continent attorney Johnson to split the costs of Scott-Macon's defense (an offer it concedes it did not explicitly accept), and the subsequent practice of Scott-Macon's defense counsel in providing Mid-Continent with confidential defense documents beginning in November, 2001. "These circumstances indicate there was a meeting of the minds and mutual assent on behalf of both parties that Scott Macon was an additional insured under the Mid-Continent Policy and that the insurers would share the defense costs." Dkt. 24 at 9.

Mid-Continent contests the characterization of attorney Johnson's November 8, 2001, letter as an "offer" by Mid-Continent to split defense costs. Indeed, the record establishes that the parties had been negotiating concerning their rights and obligations under the Mid-Continent policy for months, and that they had substantial disagreement concerning Mid-Continent's obligations. Northfield's initial position, as evidenced by its repeated tendering of Scott-Macon's defense to Mid-Continent, was that Mid-Continent should be **entirely** responsible for Scott-Macon's defense **and** indemnity on a primary basis. Mid-Continent initially denied that Scott-Macon was covered under the applicable policy. As discussions continued, however, Johnson conceded in his October 12 letter that Scott-Macon was an "additional insured" under the Mid-Continent policy, but he then requested copies of Northfield's policy provisions, which he specifically indicated were necessary in order for an agreement to be reached with respect to both defense and indemnity. Dkt. 26, Exh. A-1 at 7. Northfield refused to provide the requested documents, and Johnson further explained his need for those documents in his November 8 letter. While it is true that Johnson indicated his belief that defense costs should be shared between Northfield and Mid-Continent under the applicable

contractual provisions, there is no indication that he intended this to be an offer that Northfield could accept without also reaching an agreement on indemnity. Northfield has provided no evidence that Johnson's letter was anything more than an invitation to continue discussions of the parties' rights and obligations.

A helpful comparison is supplied by *Jordan v. Sony BMG Entertainment, Inc., et al.*, 637 F.Supp.2d 442 (S.D.Tex. 2008), *aff'd in part*, *remanded in part*, 354 Fed.Appx. 942 (5th Cir. 2009), where the court addressed a dispute over music royalties. Jordan maintained that Sony had agreed to a royalty payment independent of the royalties owed under a Production Services Agreement. The court held that Jordan failed to raise a genuine issue of fact because the communications he cited in support of his claim "indicate only that Sony sought to determine . . . the final publication splits among the writers and producers so that, thereafter, Sony could calculate royalties payable on each song" but there was "no evidence of any meeting of the minds or implied contract that Sony, independent of [the underlying contract], owed Jordan royalty payments." *Id*. at 452. Similarly, Johnson's communication of Mid-Continent's position on defense costs is not evidence that the parties made a new agreement independent of the underlying insurance policy.

Nonetheless, Northfield argues that Johnson's November 8 letter indicates that "Mid-Continent was concerned with the allocation of the defense and indemnity costs and not whether it had these obligations." Dkt. 24 at 9. This does appear to be the case, but it proves too little. Northfield's burden is not to establish the parties' rights and obligations under the Mid-Continent Policy. Northfield has alleged that a separate, implied agreement was reached and, in order to prove this, it must present evidence of mutual assent. Not only is Johnson's November 8 letter inadequate to permit a finding that Mid-Continent assented to a new agreement, but Northfield's conduct is also not sufficient to establish its assent. More specifically, Johnson conceded that Scott-Macon was an

10

"additional insured" covered under an endorsement to the policy, but it is clear that Northfield's Laursen never agreed with Johnson on this point. Laursen's communications to Johnson prior to the November 8 letter, and his communications to Scott-Macon counsel Nelson both before and after Johnson's November 8 letter, indicate that he consistently believed the Mid-Continent Policy was "primary" in this case. Dkt. 23, Exhs. G, I, J. As Mid-Continent notes, Laursen's insistence that the Mid-Continent policy was "primary" is important because excess insurers are not normally obligated to participate in a defense until the limits of the primary policy have been exhausted. *See Schneider Nat'l. Transport v. Ford Motor Co.*, 280 F.3d 532, 538 (5th Cir. 2002). Thus, Laursen's adamant position that Mid-Continent's policy was "primary" prevents Northfield from establishing that **it** agreed that the defense costs should be split, much less that Mid-Continent did so.

And, of course, the complete lack of any communication between Northfield and Mid-Continent about defense costs for seven years following the alleged November, 2001, agreement is particularly compelling evidence that the parties did not mutually assent to split those costs. From 2001 through 2008, Northfield received and paid bills for Scott-Macon on a monthly basis, but neither demanded payment, nor did it even inform Mid-Continent of the size of the tab Mid-Continent was allegedly accumulating. Mid-Continent, for its part, made no inquiry about the ever-mounting legal bills it is alleged to have agreed to split. This mutual disinterest concerning the matter of Scott-Macon's defense costs was interrupted only by Mid-Continent's settlement of claims for its insureds in October, 2008. Had the parties intended to reach an agreement to split the cost of defense separate from the underlying policy provisions, some mention of that agreement would certainly have been made during the lengthy state court litigation.

Northfield argues that the provision of privileged defense documents to Mid-Continent by counsel for Scott-Macon beginning in 2001 establishes that the parties reached an agreement to share

defense costs.  The court disagrees.  While Scott-Macon's sharing of information is consistent with the existence of an agreement to share defense costs, it is equally consistent with Northfield's repeated attempts to tender the entire defense to Mid-Continent pursuant to the terms of the Mid-Continent Policy.  Therefore, the provision of defense documents to Mid-Continent does not raise a genuine dispute of fact concerning the parties' assent to an agreement separate and apart from the underlying insurance policy.  *Compare*, *Sirrah Companies, Inc. v. Budget Rent-A-Car Corp.*, 2009 WL 563654 at *12 (W.D. Tex., March 4, 2009) (Alexander, J.) (parties continued to operate under the terms of a previously expired contract, including the continued payment of fees for reservations, was sufficient conduct to reflect a meeting of the minds).[4]

Northfield has failed to carry its burden of presenting a dispute of material fact that the parties mutually agreed to Mid-Continent being responsible for one-half of Scott-Macon's defense costs.

**B. Claim for defense costs after October 3, 2008.**

The parties agree that Mid-Continent cannot be liable for any costs related to Scott-Macon's defense that were incurred after Mid-Continent exhausted the limits of its policy on October 3, 2008, and Mid-Continent is entitled to summary judgment in this respect.

---

[4] Mid-Continent made a payment to Northfield on July 20, 2010, of $143,000 representing one-half of Scott-Macon's costs of defense from May 26, 2005, through October 3, 2008.  Dkt. 30 at 2.  Northfield asserts that this is additional evidence that there was an implied-in-fact contract.  Mid-Continent, however, had already denied the existence of an implied-in-fact contract in this case, and the payment was accompanied by a letter indicating that Mid-Continent "does not intend to waive any of its rights and defenses . . . ."  Dkt. 30, Exh. 2.  Indeed, the payment may have been the result of Mid-Continent's position with respect to Northfield's contribution and subrogation claims.  Therefore, the court finds that Mid-Continent's partial payment of defense costs is simply not relevant to the issue of whether an implied-in-fact contract exists.

**C. Statute of limitations.**

Mid-Continent also moves for partial summary judgment for any and all claims made for defense costs incurred prior to May 26, 2005, or four years before this action was filed. Dkt. 18. Mid-Continent argues that the applicable limitations period is 4 years, and that claims for defense costs accrued as those costs were billed to Northfield. Northfield responds that Mid-Continent did not breach its duty to pay one-half of Scott-Macon's defense costs until it refused Northfield's request for payment in February, 2009. Dkt. 21 at 1.

Initially, there is no need to address the statute of limitations argument with respect to Northfield's implied-in-fact contract claim since, as discussed above, Mid-Continent is entitled to summary judgment on the merits of that claim. What remains are Northfield's claims for subrogation and contribution that are, in turn, premised upon Mid-Continent's alleged breach of its duty to defend Scott-Macon pursuant to the terms of the Mid-Continent Policy.[5]

Breach of contract claims are subject to a four year statute of limitations under Texas law. *See Stine v. Stewart*, 80 S.W.3d 586, 592 (Tex. 2002). A breach occurs and claim accrues when a party fails to perform a duty under a contract. *Id*. Mid-Continent notes that Texas applies the "legal injury" test whereby a claim does not accrue until a claimant possesses facts sufficient to permit it to seek a judicial remedy. *Mayo v. Hartford Life Ins. Co.*, 354 F.3d 400, 410 (5th Cir. 2004). Thus, in Mid-Continent's view, Northfield suffered identifiable legal injury under Texas law each time it received a bill for legal expenses that Mid-Continent should have paid (or paid in part). The Texas Supreme Court, in an analogous situation where it was called upon to determine when a claim

---

[5]     The court agrees with Northfield that there is no need to enter into an "eight corners" analysis to determine if Mid-Continent actually had a duty to defend under the Mid-Continent Policy. *See Northfield Insurance Co. v. Loving Home Care, Inc.*, 363 F.3d 523, 527-28 (5th Cir. 2004) (setting forth analysis to be applied in determining existence of duty to defend under Texas law). Mid-Continent's argument concerning the statute of limitations assumes, for purposes of analysis only, that a duty exists.

13

seeking the prompt payment penalty under the Texas Insurance Code ripened, held that "the insured has suffered an actual loss that is quantified after the insured retains counsel and begins receiving statements for legal services." *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.2d 1, 19 (Tex. 2007). The court agrees that Northfield's claims under the Mid-Continent Policy for payment of defense costs accrued, at the latest, at the time that Northfield received bills for legal services that should have been paid, at least in part, by Mid-Continent. Thus, any claim made for legal services billed to Northfield prior to May 26, 2005, is barred by the applicable statute of limitations, and Mid-Continent is entitled to summary judgment in this respect.

### CONCLUSION

Upon consideration of the motions and all responsive pleadings, as well as the evidence submitted and the applicable law, plaintiff Northfield Insurance Company's motion for summary judgment (Dkt. 24) is DENIED, and defendant Mid-Continent's motions for partial summary judgment (Dkts. 18, 23) are GRANTED.

Signed at Houston, Texas on September 16, 2010.

_____
Gray H. Miller
United States District Judge